argument next in O'Day v. Shatila, 18.2621 and 18.2632. May it please the Court, Daniella Quitt for Plaintiff's Appellants. In granting defendants motion to dismiss plaintiff's ERISA claims at the pleading stage, the court below did not have the benefit of this court's decision in Jander v. The Retirement Plan of IBM, which was issued after we had filed our opening brief. Jander makes several points which are highly relevant and would support reversal by this court or be a basis for reconsideration by the court below. While this court held that a fiduciary need not fear an irrational overreaction to the disclosure of fraud, the court below made a factual finding that notwithstanding the very small amount that the plan held during the relevant period, which was 0.03 percent, and the fact that many of the funds were selling the stock in the millions during the relevant period, the court below held that any disclosure, quote, would have prompted a negative market reaction on a scale beyond the mathematical proportion of the plans holding standing alone. That's a small percentage of the stock, but you're talking about all the insiders unloading, right? Well, the funds, I think they dumped like $25 million. What we're saying is that this court says you don't presume that there's an overreaction, and we're saying this court's decision is consistent with Fifth Third, remembering that Fifth Third v. Dudenhofer said, listen, plaintiffs, we're not saying there's a presumption. What we're saying is the market absorbs all the information. Now, why is this case a little bit different than some of the other cases, and why is it more like Jander? Because we say that what happened there, everything was going to come out. You can't hide the fact that there were these loans with big investment bankers that they couldn't pay. At the start of the class period, they announced a $2.2 billion transaction, which the market immediately reacted negatively. The very next month, under the helm of Mr. Wubles, who was on the investment committee, they took out a loan with Goldman at a commercial effective rate of 15 percent, compared to what would have been 5 percent, had they been in a better financial position. Now, the terms of that loan are not disclosed. Now, Mr. Wubles knew it. Mr. Chatilla knew it. It's not disclosed until November. It's months later. What you're principally suggesting here, and I realize you have other arguments, but I'm saying this is a case where it's because of the inside information that the trustees were required to act, and what you've said so far is that the action they should have taken is to disclose the inside information that they knew. Yes. They should have disclosed the information they knew about the loans, and the loans, what's also important is these loans were originally classified as non-recourse loans, meaning they weren't going against the value of the stock. Ultimately, which is why I think it's like Jander and it's inevitable, in November, months later, this information all came out. You can't, when you're borrowing money from Peter to pay Paul, you can't keep it a secret. They went so far as to raid their own yield companies to get money to make these payments. Mr. Wubles himself was the person who arranged the wire from the yield company back to SunEdison. They couldn't make these payments. This information was coming out in drips and drabs. So yes, we're saying predominantly this insider should have disclosed what the true position was. So you're not, what you're not saying, or at least you're not, it's not this argument that the ESOP option should have been closed down or that they should have sold their stock from that, out of that fund. Not at the very beginning, no. What we're saying is the insider had information that was available to him in July and August, but by the time the fall comes along, October, November, when all the financial press is saying, oh, did you hear, we heard about the Goldman loan, they disclosed, the company discloses itself in November, the committee still didn't do anything. What this company, what they argued in essence in this brief was not only did the insiders not do anything, but nobody had to do anything. There was a public asset and therefore they could sit back, let the chips fall and whatever happens, happens. That's what they did here. Well, that's a, that's a separate set of questions that maybe we'll get to later. But to get back to the insiders, does this mean in effect that any public company that has an employee stock ownership plan as an option in its ERISA program is effectively subject to greater obligations to make public disclosures than would be the case under the securities laws? In other words, that I take it it's a premise of this whole discussion that these insiders were not under an obligation under the securities laws in general to notify the investing public that this company is going south in between whatever financial statements were regularly due. But effectively they are under such an obligation to their employee participants, which effectively becomes an obligation to the general public. I think it's the latter because what happened here is, this isn't something where something just happened overnight. They knew, and certainly the insiders knew already in July and August, they knew that they didn't have the money to make these payments. And so maybe they don't have to disclose the demise of the company, which is what the defendant said that we were saying. But they do have to disclose the true terms of all these agreements, which is something that in each stage, they withheld things for several months, which they could have disclosed. And to answer the other part of your question, I'm actually saying that it's a two part. The insiders had an obligation early on, but at some point here, the rest of the committee who had access to information, this isn't like Lehman Brothers where this court said, any investigation here wouldn't have let them learn about it quickly. The demise happened overnight. I'm saying this is exactly Jander, where the information was going to come out. Does it matter at all that the actual retirement plan that was created says that they don't have that option? That they can't, the investment committee reserves the right to change any investment options provided that it has no power to eliminate the employee stock ownership fund. And in fact, I think that's what the MEMC stock fund is. And that is a provision, a plan that says they can only invest in this stock. And except for such cash as is necessary to meet liquidity. So help me out with that. That's what everybody knew going into the, deciding to put some of their money into this plan. But they could have frozen it. They could have arranged, I just want to, if I could answer your question. Yes. I see. They could have done something, because here, at least under the facts of this case, because I think in some cases, you just simply don't have enough time to do anything. But in this case, they had the ability to freeze it. We listed several options that they could have done. But the problem is, is that during this relevant period, it's not even that they increased the plan holdings from 800 to 1,350, 25 million shares were dumped. By everyone else, even just reading the newspaper articles. And the fact is, what shows that this information was going to come out, they themselves disclosed it. They went into bankruptcy court, and they said, you know, this was a problem, it was a year in the making, the handwriting was on the wall. They argued in the securities case before the same judge, albeit after he decided our case. They argued at points in time where the class period should end, because all the information they argued was in the marketplace. So what they, in effect, said was that the public should have known, everyone should have known, except the people on the investment committee. That turns trust law on its head. That basically says, if there's a market price, we just sit back, we don't do anything, and whatever happens, because we're handcuffed. That's not what Fifth Third held, and in fact, Amgen said, freezing the plan might be a possibility that satisfies Fifth Third, but we can't tell on this complaint, and it remanded it. That's what we're saying here. With the information of the Second Circuit's decision in Jander, and going back to what Fifth Third really says, that the decision needs to be revisited. Because otherwise, you're saying that it's a publicly traded security. And at the pleading stage, with all the constituent facts that we argued, that's it. Game over. Sit on your hands. Thank you very much. Thank you. You have two minutes for a vote? Yes, thank you. So we'll hear from the other side. Mr. Blocker. Good morning, your honors. May it please the court, Mark Blocker for all the defendants. Counsel is correct that at the time the district court decided this case, it did not have the benefit of the Jander decision. But it did have the benefit of the Supreme Court's decision in Dudenhofer, and this court's decision in Reinhart. And the district court correctly applied Reinhart and Dudenhofer in this case, and that is why you should affirm. There were two claims in this case. One was a public information claim that the fiduciary should have known from publicly available information that the company's stock fund was imprudent. There was a separate claim that there was insider information from non-public information. They should have done something with respect to the stock. Jander does not address the public information claim, and that was a focus in the district court of the plaintiffs. This case, the case that is on all fours with this one is the Reinhart decision, this court's decision in Reinhart. And it said, as did the Supreme Court, that public information claims, or claims that fiduciary should have figured out that stock is imprudent, solely from available public information, are implausible as a general matter, absent special circumstances. In this case, you have the same sort of public information. The plaintiffs were relying on exactly the same sort of public information that you had in Reinhart. It was newspaper articles, analysts saying different things, volatility of the stock price. There was absolutely, factually, no difference in the public information arena between this case and between Reinhart. And so the court was correct to dismiss the public information claim. There was also no plausible claim of special circumstances. Two points about that. One is that on special circumstances in the district court, the plaintiffs- Well, where should I put some portion of my retirement savings? I'm trying to be pretty conservative about this and look for long-term investments. And he said, well, at the time that this was going on, you should put your money into SunEdison because I notice it's been going down, down, down, down. But the price is now pretty cheap, and so there's a huge upside potential to this. Would it not be appropriate to question that as an imprudent investment, just because it's a high-risk investment? It might have a big upside, but it also has the possibility that you'll lose every dollar you put in, and that's not the way- In other words, it can be a perfectly appropriate market price that $10 a share at this moment in time is exactly what the market thinks it's worth, taking into account the upside potential and the downside risk. But isn't that what Know Your Investor is all about, and what different investment goals would be? In other words, it's a long way of saying, is imprudence the same thing as a fair market price? Well, two points about that. I mean, Judge Lynch, you said right out of the gate, I go to my advisor and I tell him I'm a conservative investor. This is a plan with thousands of investors, and they're not all conservative. They're not all Judge Lynch. And so some of them are going to want to take more aggressive stances. This plan had a number of investment options. This wasn't the only one. It was a 401k, where participants could self-direct their cash. Each employee or each participant in the plan gets to say, I'm going to put all my chips in this one, or I'm going to put a very small portion in this one, and I'll have some other things that are more prudent. But if this is a risk, fine. It's a risk inherently that I'm investing in a single stock rather than- It's undiversified. So by definition, it's risky. But yes, you could have a younger employee, for example, who decides, I've got 30 years until I retire. I'm going to put a lot of money. I know this is risky, but I'm going to put my money into it. And so what you want is a menu of options that span the risk-reward spectrum. And there's nothing wrong with having a risky option. But to answer the second part of your question, Judge, that's exactly what this court grappled with in Reinhart. The question was, is it OK to have something that's risky? Can you have a public information claim that's based solely on, well, I think this was too risky for a 401k plan? That's the question that the Supreme Court answered in Dudenhofer and said no. It's the question this court answered squarely in Reinhart and said no. So I don't think you can't have an imprudence claim that says, I'm going to look around at the public information and decide this is too risky for a 401k plan. That's exactly the claim that was eliminated. But let's talk for a minute, if I can, about the insider information claim. The gender. Yeah, so gender. So this case isn't gender, and let me explain to you why. So the facts of gender are roughly the following. IBM was going to sell a division that, at least it was alleged, was overvalued. And it knew it was going to sell a division, it was going to sell a division shortly. And there was also allegations not present in this case that by making the disclosure earlier, that there was going to be a smaller price impact than if they made the disclosure later, okay? So a couple things about this. First, disclosure here was not inevitable. The claim that this company, the idea that this company was insolvent, headed for bankruptcy, there was no way that that was a known fact at the beginning of the class period that was inevitable in the way that the sale of the gender division, which everybody knew was going to take place, was inevitable. The second thing, though, and the court specifically, this court specifically said in gender that that was an important fact. That because it was inevitable, that it should have been disclosed earlier. But the second point that makes this case different than gender is, in gender, the argument the plaintiffs were making is that there was going to be reputational damage to management if they didn't make the disclosure earlier. But if what the plaintiffs are saying, and we think that's a fair reading of their complaint, is this company was insolvent on day one of the class period, there wasn't going to be any bigger harm to the reputation of this company. There wasn't going to be anything left of this company if it made those disclosures on day one. So if you put yourself in the shoes of the fiduciary and you apply the Dudenhoffer more harm than good standard, it's perfectly reasonable that the fiduciaries would say to themselves, you know what? Even if they thought the company was insolvent, let's just assume that for a minute. Maybe we'll beat this thing, maybe the market will turn back. But to say something that's going to kill the company on day one is sealing the fate of everybody. The stock right down to zero. It's going to take the stock right down to zero right now. So this isn't Jandor where the stock would have gone down $10 if you had disclosed it on day one, but $15 if you disclosed it much later in time. This was stock going down either 100% now or 100% later, according to the plaintiffs. And so we're not in the Jandor scenario. And the other thing that I would caution is, the Supreme Court in Dudenhoffer was trying to find a way at the motion to dismiss stage to cut down on meritless lawsuits. If you use the Jandor, if you take seriously the notion, well, any disclosure that's inevitable means that plaintiff states a claim. Every disclosure, you could always point to some later event and say, well, it was inevitable, it was going to come out because of x or y event. If inevitable disclosure is the new standard, then Dudenhoffer's meaningless. Because every complaint that's brought is going to state a claim. There's not going to be any separating out of the meritless goats from the plausible sheep or whatever turn of phrase the Supreme Court has. So Jandor can't mean that any time disclosure is quote inevitable for reasons we can drum up that the stock is somehow improving. Let me ask you about that. You just said that Jandor is distinguishable because the disclosure here would have resulted in the inevitable demise of the company. And my question is, how do we know that? That's what the plaintiffs are pleading. That's what was in their complaint. So if you look at a couple of paragraphs, Judge, in particular, I would point you to 178 and 123. But the plaintiffs were essentially saying that if they said, and they said this repeatedly in their briefs in this court. They said this company was hopelessly insolvent. So from day one, this company was insolvent. If you made disclosures, the market would have known this company was insolvent. So if this company's truly insolvent, Judge Kogan, what's going to happen is the market's going to process that information. Stock is going to go to zero. That's how we know that. That's what the plaintiffs are pleading. That's their entire theory of this particular complaint. So the fiduciaries here, if you apply the more harm than good standard, what the standard says is, could a fiduciary have determined that making an earlier disclosure would do more harm than good? Could he have reasonably determined that? And it's in spades in this case. It's painfully obvious, and this is what the district judge was saying. It's painfully obvious that a district, that a fiduciary in the position of Sun Edison could decide that this was not a disclosure that was going to do more harm than good. What's going to happen is what Judge Loyer mentioned, which is the stock is going to go to zero if we make these disclosures. So let's see if we can beat this thing. Let's see if we can do better. Even if you assume, and again, there's no reason to really believe this, but even if you assume the fiduciaries knew and thought this company was insolvent, saying it on day one wasn't going to help anybody. It was only going to hurt the participants in the SunEd stock fund who already held the shares. So we think that at the end of the day, gender is not on all fours and is distinguishable. And because the district court correctly applied both Judenhofer and this court's decision in Reinhart that the district court judge should be affirmed. Thank you. I want to address the last point first, even though I want to also respond to one of the questions that Judge Lynch posed for my adversary. We don't allege that the stock would have gone to zero. In fact, all of the things that I told you that should have been disclosed earlier about the proper classification of the loan and the real terms. The company disclosed it in November. The stock didn't go to zero. It went to three or four dollars. That's what the complaint says. It's defendant's analysis of our complaint that says that we said that they had to disclose bankruptcy, that it would have gone to zero. But it is inevitable if you take out a loan with a large bank like Goldman and you lie about the terms. It's the same thing as if you have a gap violation in a subsidiary that you're trying to sell. Eventually, people are going to find out that you don't have the money to pay. That's what they said. They want to have it both ways. They want to cut the class period. They want to get debtor in possession. We did everything we can. We didn't say that they had to disclose all of that. We said you had to tell the truth and you had to tell it contemporaneously. They waited six months to tell. There was any number of times, it was an eight month period. November was six months before they announced bankruptcy. They didn't do anything. They did freeze the plan when there was a Department of Justice investigation. And the other point is prudence does not equal the fair market price. The whole point of all of these cases that have said that risk is reflected in the price, sometimes something could be imprudent because of the way the company is headed. We don't have to presume it'll go to zero for it to be imprudent. I didn't see the point of that logic, but how is that consistent with Reinhart? Because in Reinhart, this court held for one thing that it was a matter of days where the company fell apart. The plaintiffs relied on SEC orders which said something might happen regarding, I can't remember the specific, but it was something that was not a certainty that was going to happen. The fact that they didn't have the money to pay these margin loans, or that they were borrowing money at these ridiculously commercial rates, that they had to go to their own yield companies, disband them, something called the Friday Night Massacre. They put themselves in there. Listen, Mr. Wubles negotiated the loan. He was the one who did the wires from the yield company. This was in December. The company filed for bankruptcy in April. There's a lot of time for both the insiders and the other committee members to have done something. Because they really can't have it both ways. If you say the market, which is what Jander said, yes, in the context of inside information. But we don't have to presume that there's going to be an overreaction. The purpose of all of the fifth third, we have market efficiency. Market efficiency isn't just one factor. It's a lot of factors. It's how many shares are involved. And in order to reach the decision that our judge read, he had to disregard every other factor and every other allegation, and he seized on that one. And- Thank you very much. Thank you very much. We'll reserve the decision.